JOHN BALAZS, Bar # 157287
Attorney at Law
916 2nd Street, Suite F
Sacramento, CA 95814
Telephone: (916) 447-9299
balazslaw@gmail.com

KYLE KNAPP, Bar #166587
Attorney at Law
916 2nd Street, Second Floor
Sacramento, CA 95814
Telephone: (916) 441-4717
kyleknapp@sbcglobal.net

Attorneys for Defendant
MATTHEW ROBERT ALLISON

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-CR-0257-DC |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR BAIL REVIEW** |
| vs. | |
| | Motion Hearing: |
| DALLAS ERIN HUMBER, | Date: February 10, 2025 |
| MATTHEW ROBERT ALLISON, | Time: 2:00 p.m. |
| Defendants. | Hon. Sean Riordan |

TO    MICHELLE BECKWITH, Acting U.S. Attorney, ROBERT ABENDROTH, Assistant U.S. Attorney, CHRISTOPHER J. PERRAS, DOJ Special Litigation Counsel, and JACOB WARREN, DOJ Trial Attorney

NOTICE IS HEREBY GIVEN that on February 10, 2025, at 2:00 p.m., or other time set by the Court, before the Honorable Sean Riordan, U.S. Magistrate Judge, the defendant, Matthew Robert Allison, through counsel, does and will

move for an order granting his release on a combination of conditions for the reasons set forth in the attached Memorandum of Points and Authorities.

Bail review is appropriate because, among other things, there is new information as to a secured bond and residence where Mr. Allison can reside upon release that was not available at the time of the initial detention hearing. 18 U.S.C. § 3142(f); E.D. Cal. Rule 429.

This motion is based on the instant motion and attached Memorandum of Points and Authorities, and any evidence or argument presented before or at the hearing on this motion.

Respectfully submitted,

DATED: February 3, 2024

/s/ Kyle Knapp
KYLE KNAPP

/s/ John Balazs
JOHN BALAZS

Attorneys for Defendant
MATTHEW ROBERT ALLISON

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Matthew Allison seeks reconsideration of the court's initial decision to deny pretrial release.  Punishment should follow conviction, not precede it.  At the prior detention hearing, the defense submitted the issue of detention because Mr. Allison had no available bond to post or place to reside. The defense now proposes that he be released on the condition that he post an appearance bond secured by the unencumbered residence of his father John Allison and his wife and that the defendant reside at their home in Missouri with any other conditions the Court deems appropriate to secure his appearance in court and the safety of the community.  If the Court deems necessary, Mr. Allison agrees to abide by a condition that he not access the internet and be subject to home confinement with monitoring.  Without release, Mr. Allison is likely to serve a lengthy period of pretrial custody even though he has strong arguments that all his activities on Telegram were protected First Amendment speech.

## II.    PROCEDURAL BACKGROUND

In an indictment filed September 5, 2024, the government charged defendants Dallas Humber and Matthew Allison with the following 15 counts: conspiracy in violation of 18 U.S.C. § 371 (count 1); solicitation of a hate crime in violation of 18 U.S.C. § 373 (counts 2-5); solicitation of murder of a federal official in violation of 18 U.S.C. § 373 (counts 6-8); doxing of federal officials in violation of 18 U.S.C. § 119  (counts 9-11); interstate threatening communications in violation of 18 U.S.C. § 875(c) (count 12); distribution of information relating to explosives and destructive devices in violation of 18 U.S.C. § 842(p) (counts 13 and 14); and conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A (count 15).  ECF No. 1.

The next day, Mr. Allison was arrested at his apartment complex in Boise, Idaho and ordered transported to Sacramento.  He did not resist or cause any disturbance when arrested.  Because he believed he had committed no crime, Mr. Allison submitted to a 2-hour interview by law enforcement and voluntarily provided the passcode to his two phones.

The government then filed a joint detention brief with respect to both Humber and Allison.  ECF No. 11.  In federal court in Boise, Mr. Allison was ordered detained and transferred to Sacramento.  At a hearing here on October 16, 2024, the magistrate court ordered Mr. Allison detained pending trial.  ECF No. 26.  At the time, Mr. Allison did not have a suitable place to reside and the defense submitted the issue of detention without evidence or argument.  Mr. Allison was not interviewed by pretrial services.  The Court found that a rebuttable presumption of detention applied and ordered Mr. Allison detained on that basis. ECF No. 26.

On January 10, 2025, the government filed a motion for a pretrial conference under the Classified Information Procedures Act (CIPA), 18 U.S.C. App. III, §2. ECF No. 37.  At a hearing on January 17, 2025, the Court granted the government's unopposed request to appoint a Classified Information Security Officer and set a further status conference for March 28, 2025.  ECF No. 38.

Under a stringent protective order, the government has provided defense counsel almost 60,000 bates-numbered pages of discovery, including a large number of audio and video recordings.  Mr. Allison was recently transferred from Yuba County Jail to Butte County Jail, which is at least a three-hour, round-trip drive from Sacramento.

### III.   ARGUMENT

#### A.   Legal Standards

A bail hearing may be reopened "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person or the community."  18 U.S.C. § 3142(f).

In cases where there is probable cause to believe that the defendant committed certain offenses, including offenses listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years of more is prescribed, there is a rebuttable presumption that the defendant is a flight risk and danger.  18 U.S.C. § 3142(e)(3).  Because the offense charged in count 15 (conspiring to provide material support to terrorism in violation of 18 U.S.C. § 2339A)[1] is listed in § 2332b(g)(5)(B) and carries a maximum term of 15 years imprisonment, the presumption categorically applies.  *United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008).

The presumption shifts the burden of production, not the burden of proof. Although the rebuttable presumption requires the defendant to present some evidence that he is not a danger or flight risk, the burden is small, requiring that the defendant produce only "some credible evidence" that he will appear in court and

---

[1]   18 U.S.C. § 2339A states, in relevant part:

(a) Offense.—Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [enumerated sections, including 18 U.S.C. 844(f)(1)(2), 844j, 1114, and 1366].

not pose a threat to the community. *United States v. Chen,* 820 F. Supp. 1205, 1207 (N.D. Cal. 1992). Once such evidence is provided, the ultimate burden of persuasion remains on the government. *See, e.g. Hir,* 517 F.3d at 1086. To detain an individual on the ground of danger, the government must establish by "clear and convincing evidence" that there are no conditions of release that would reasonably assure the safety of the community. *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985); 18 U.S.C. § 3142(f). The question is not whether the charged offenses involved a danger to others in the community in the past, but whether the defendant would represent a danger to the community or others if released. *See United States v. Rodriguez,* 897 F. Supp. 1461, 1463 (S.D. Fl. 1995). Clear and convincing evidence means proof that a particular defendant poses an actual danger not that he or she in theory poses a danger. *United States v. Patriarca,* 948 F.2d 789 (1st Cir. 1991).

The Ninth Circuit has repeatedly stated that "[o]nly in rare cases should release be denied" and that any "[d]oubts regarding the propriety of release are to be resolved in favor of defendants." *United States v. Townsend,* 897 F.2d 989, 994 (9th Cir. 1990); *see Motamedi*, 767 F.2d at 1405. In determining whether there are conditions of release that will reasonably assure the appearance of the defendant and the safety of the community, the Court considers (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). Because the Court should not make a pretrial determination of guilt, the weight of

the evidence is generally the least important factor in determining release, *Motamedi,* 767 F.2d at 1408, except that where the evidence is weak, this factor "becomes an important factor favoring release." *Chen,* 820 F. Supp. at 1207-08.

**B.  The  Court should order defendant Matthew Allison released to the third-party custody of his father with other appropriate conditions that will reasonably assure his appearance in court and the safety of the community.**

Release conditions can be fashioned that can reasonably assure Mr. Allison will make his court appearances and not be a danger to the community or any other person.  The defense proposes that Mr. Allison be released to the third-party custody of his father John Allison in rural Missouri and be ordered to reside with his father and his wife under any conditions the Court deems appropriate, such as home confinement and restrictions on internet access.[2]  John Allison and his wife are willing to post their 10,000 square foot residence to secure his son Matthew's release.  They live alone, have an extra bedroom for Matthew, and would like Matthew's help in remodeling their large residence.

The relevant factors here weigh strongly in favor of release pending trial.

**1.    Nature and circumstances of the offense**

The Indictment alleges that defendants Humber and Allison committed a number of offenses based on their involvement in a series of channels and group chats on the Telegram Messenger communications platform that allows users worldwide to communicate with one another.  The government alleges that this series of channels and chats, which it calls the "Terrorgram Collective," "promote white supremacist accelerationism: an ideology centered on the belief that the white race is superior; that society is irreparably corrupt and cannot be saved by political action; and that violence and terrorism is necessary to ignite a race war

---

[2]    John Allison's contact info and address will be provided to pretrial services.

and 'accelerate' the collapse of the government and the rise of a white ethnostate." ECF No. 1, at ¶ 2.

Although he was active in these Telegram channels and chats, there is nothing to support the government's view that Allison was a "leader." The chats are mostly a chaotic mix of hyperbole and posts without any recognized leader. Before Telegram, Mr. Allison posted content on YouTube while taunting censors with the moniker "BanThisChannel." On Telegram, he also ran other non-violent, right-wing political channels, including New Right News, Right Side News, and War Room Pandemic, the latter posted content similar to Steve Bannon's "War Room" podcast.

In administering and contributing to these channels and group chats, the government contends that Humber, Allison, and others disseminated a digital publication entitled "The Hard Reset" explaining their ideology and providing encouragement and instructions for others to commit acts of violence in support of their cause. *Id.,* ¶ 5. Likewise, the Indictment states that Humber and Allison produced and disseminated on Telegram a 24-minute documentary entitled "White Terror" that "chronical[s] and celebrat[es] 105 white supremacist attacks perpetrated between 1968 and 2001." *Id.,* ¶ 8.[3] The Indictment further contends that Humber and Allison also disseminated a list of potential targets on channels, group chats, and direct messages by doxing them by posting links and List cards (with home addresses and photographs) to Telegram users. *Id.,* ¶¶ 9-15.

When the indictment discusses specific postings, however, almost all are alleged to have been made by Humber. *Id.,* ¶¶ 16-32. In the vast majority of

---

[3]    Not all of the attackers in "White Terror" espouse racist ideology. Theodore Kaczynski, for example, held no such racist views; his crimes were motivated by anti-technology sentiments.

instances, Allison's alleged involvement consists simply of reposting content of Humber or others in one or more of the hundreds of channels or chats he administered or participated in. *See Id.,* ¶¶ 16-32. Significantly, the Indictment does not allege that Allison did anything more than communicate or disseminate propaganda on Telegram with respect to any of the charges against him. There are neither allegations in the Indictment nor evidence in discovery that he participated in any act of violence or hate crime in real life.

In these circumstances, conditions of release can be fashioned to reasonably assure the safety of any other person and the community. Such conditions could include restrictions on internet access and/or home confinement with electronic monitoring.

### 2.    Weight of the evidence

Given the presumption of innocence, the weight of the evidence is generally the least important factor in a release decision. Nonetheless, even at this early stage of the proceeding, it is worth noting that Allison appears to have a strong defense that his Telegram communications are protected by the First Amendment.[4] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. U.S. Const., Amend. IV; *see Watts v. United States,* 394 U.S. 705, 707 (1969) (explaining that a statute "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in

---

[4]    Moreover, Mr. Allison is likely to have other defenses to the charges against him. For example, counts 2-5 appear to be multiplicitous and should amount to at most a single charge. It also doesn't appear that Mr. Allison's Telegram communications amount to "material support or resources" to terrorism under 18 U.S.C. § 2339A in count 15 (the only charge carrying a presumption of detention) under the definitions set forth in subsection (b) of § 2339A. *Cf. Hir*, 517 F.3d at 1093 (noting that defendant provided material support by giving "money and supplies" to his brother with full knowledge of his alleged terrorist activities).

mind"). The Supreme "Court has recognized that expression on public issues 'has always rested on the highest run of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown,* 447 U.S. 455, 467 (1980)). "[S]peech is of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phillips,* 562 U.S. 443, 453 (2011) (quoting *Connick v. Myers,* 461 U.S. 138, 145 (1983)). The First Amendment protects symbolic or expressive conduct along with actual speech. *Virginia v. Black*, 538 U.S. 343, 358 (2003), and cases cited therein.

"It is well-established that the First Amendment protects speech that others might find offensive or even frightening." *Fogel v. Collins,* 531 F.3d 824, 829 (9th Cir. 2008). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder,* 562 U.S. at 458 (upholding church's right to picket military funerals to communicate its belief that God hates the government and military for its tolerance of homosexuality) (quoting *Texas v. Johnson,* 491 U.S. 397, 414 (1989)). "Speech 'may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with the conditions at they are, or even stirs people to anger.'" *Fogel,* 531 F.3d at 829 (citing *Terminello v. City of Chicago,* 337 U.S. 1, 4 (1949)). Even speech advocating violence is protected under the First Amendment unless such "advocacy is directed to inciting or producing *imminent* lawless action and is not likely to incite or produce such action." *Bradenburg v. Ohio,* 395 U.S. 444, 447 (1969) (emphasis added) (overturning the conviction of a Klu Klux Klan leader who was convicted under an Ohio statute for advocating the use of violence and criminal acts for political reform); *Hess v. Indiana,* 414 U.S. 105, 108 (1973)

(overturning conviction of protester where his words "amounted to nothing more than advocacy of illegal action at some indefinite future time").

Speech that constitutes a "true threat" is not protected by the First Amendment. *See, e.g., Watts,* 394 U.S. at 708. To determine whether speech loses its First Amendment protections, the Court must find that the speech constitutes a "true threat" under both objective and subjective standards. Under an objective standard, the question is "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco-Santillan,* 903 F.2d 1262, 1265 (9th Cir. 1990). The Supreme Court has also held that the speaker must "mean[] to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black,* 538 U.S. at 359. "A natural reading of this language embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim." *United States v. Cassel,* 408 F.3d 622, 631 (9th Cir. 2005). "The clear import of this definition is that only *intentional* threats are criminally punishable consistently with the First Amendment." *Id.; see also United States v. Keyser,* 704 F.3d 631, 638 (9th Cir. 2011) ("In order to be subject to criminal liability for a threat, the speaker must subjectively intend to threaten.").

In its detention brief, the government argued that the weight of the evidence against Mr. Allison is strong and "corroborated by [his] post-arrest-confession" in which he "admitted to his involvement with the Terrorgram Collective and confirmed the accuracy of the allegations against him." ECF No. 11, at 11. But this misses the point. In his video-recorded, post-arrest interrogation, Mr. Allison admitted his own conduct (though did not discuss others) in participating in a large

11

number of Telegram channels and chats with others that espouse similar white-nationalist worldviews. He also admitted making artwork for at least one production and making and posting some videos on Telegram, which he described as violent propaganda. But he explained his purpose as simply disseminating "propaganda" and "spreading your worldview" (HUMBER_PM_29308, at 1:26), responding to the media lying about Trump (*id.* at 1:41), and "me documenting my learning, understanding of the world, just an outlet.") (*id*. at 1:44). In the two-hour interrogation, he repeatedly told agents that he never intended to carry out any attack and he believed what he was doing was legal. *Id.* at 1:21 (Q: "Were you planning on carrying out any sort of attack? A: No.); *id.* at 1:25 ("Didn't think anything illegal about them."); *id.* at 1:36 (Allison to FBI: "What part of any of this is illegal?" and "What did I do that was illegal?"); *id.* at 1:57 ("I just thought that none of this was illegal."); *id.* at 2:18 ("I didn't think I ever was doing a crime by making videos, didn't think doing anything illegal."); 2:42 ("I didn't think any of these documents are illegal").

Indeed, there are strong arguments that all the government's allegations against Mr. Allison fall under the rubric of politically-motivated speech protected by the First Amendment. Highly-offensive, even violent propaganda, such as Mr. Allison's videos, are nonetheless protected speech unless they are directed to inciting *imminent* lawless action and likely to incite others to such *imminent* violent action—not simply that others were inspired to commit crimes sometime in the future. *See, e.g., Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 253 (2002) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."); *Hess,* 414 U.S. at 108 (holding the government may not criminalize speech for inspiring crimes "at some indefinite future time"); *Wurtz v. Risley,* 719 F.2d 1438, 1441 (9th Cir. 1983) ("The mere fact that communication

induces or 'coerces' action in others does not remove it from *first amendment* protection.") (quoting *Claiborne Hardware Co.*, 458 U.S. at 911).[5]  And communications do not constitute unprotected "true threats" unless a reasonable person would believe and the speaker subjectively intended to threaten another.  *Cf.  Sampson v. Bauer,* 261 F.3d 775, 783-84 ("although Bauer's writings have some violent content, they "are hyperbole of the sort found in non-mainstream political invective and in context . . . are patently *not* true threats") (emphasis in original), *amended* 2001 U.S. App. Lexis 22363 (9th Cir. 2001).  Mr. Allison's defense that all his speech is protected by the First Amendment will ultimately be decided at a later date by the district court or jury.  None of Mr. Allison's Telegram communications, however, appear to fall within these limited exceptions to the First Amendment.  The serious questions about the viability of the charges thus weigh in favor of pretrial release.

### 3.    History and characteristics of the person

Mr. Allison is 37 years old with no prior criminal record.  He has lived in Boise, Idaho for 17 of the last 19 years where he had a close circle of friends and worked in a variety of jobs, including most recently as a baker for a coffee shop.  He is close with his divorced parents and three siblings.  He previously helped remodel a residence with a friend in Boise and with his father in Utah.  In his

---

[5]    When Mr. Allison told the FBI during his interrogation session that he didn't understand why putting any of his videos on Telegram was illegal, the agent responded that having the views expressed on Telegram is protected by the First Amendment but when others act on his videos and posts on Telegram, then he is criminally responsible for inspiring people to commit acts of violence. HUMBER_PM_29308, at 1:57-2:00.  This is not the law.  The agent's response leaves out the key *Brandenburg* element that speech can only be punished if it incites others to *imminent* acts of violence, not just inspiring others to commit crimes in some indefinite time.

personal life, he is described as warm and friendly, contrary to the hate-filled person described by the government.

There is no evidence that he has ever missed a court appearance. In his one misdemeanor case involving roof-hopping in Boise,[6] he was cited for disorderly conduct and given a notice to appear. After making an initial court appearance, the charges were dismissed after he successfully completed community service. Mr. Allison's history and characteristics, including his lack of any criminal history, constitute strong factors weighing against a finding of danger or flight risk.

### 4. The nature and seriousness of the danger to any person or the community.

Mr. Allison poses no danger to any person or the community. The government argues otherwise in its brief by lumping him in with his codefendant's conduct and mischaracterizing the evidence against him.

First, the government emphasizes that when he was arrested, Mr. Allison had a pistol in his backpack and a rifle in a closet in his apartment. Both firearms are legal in Idaho and Idaho law allows persons to personally carry firearms. There is no evidence that Mr. Allison ever used or intended to use the firearms in any illegal manner. During his post-arrest interrogation, the FBI agent told Mr. Allison that he had "every right to carry a gun in Idaho" and thanked him for not pulling out his firearm from his backpack when agents went to arrest him. HUMBER_PM_29308, at 1:09.

Likewise, the government attempts to put its own spin on a duffel bag found in Mr. Allison's closet by characterizing it as a "go bag" with $1,500 cash, a passport, birth certificate, clothes, a masks, deodorant, a baggies of pills, a thumb

---

[6]    Despite what the government's brief states, the police report provided by government counsel shows that Mr. Allison was not wearing a mask during the roof-hopping incident. ECF No. 11, at 13.

drive, and sim cards among other items. But it fails to mention or mischaracterizes key facts. The passport had long been expired. The pills are simply vitamins. And what its brief mistakenly characterizes as "sim cards" are believed to be memory cards. Other than a few trips to Mexico when he lived in Southern California, Mr. Allison has only left the country one time for a family vacation to Europe when he was a minor. There is zero evidence that the duffel bag was part of " a plan to flee the country" as the government argues. ECF 11, at 15.

Similarly, the government is misleading in arguing that the items in his backpack could "be used to break into a house or building, tie up innocent victims, and hurt or kill them." ECF No. 11, at 13. There is no evidence of that. The backpack contained a first-aid kit and other items, which are missing from the government brief's description of its contents. Humber_PM_25947.[7] There is no evidence that the backpack was intended for any unlawful purpose as the government suggests; rather, evidence in the government's possession supports the view that the items in the backpack were for lawful personal use.

The government claims that "the Defendants have ties to a domestic and international network of terrorists" and that "both Defendants have vowed to keep doing [their activities] until the day that they die" in arguing that there is an "unacceptably high risk that [they] would not comply in good faith with" any proposed conditions of release. ECF 11, at 2. This is not the case. Other than hyperbole on Telegram, Mr. Allison has no ties to terrorists, either domestically or internationally. Although the government cites to *codefendant Humber's* recorded jail calls with Brandon Russell, the incarcerated founder of a neo-Nazi group, ECF

---

[7]    The government's brief states there was a "knife" in the backpack. ECF No. 11, at 13. This is a mistake. The FBI agent later acknowledged that a folding pocket-knife was found on Mr. Allison's person and placed in the backpack while he was being arrested. Humber_PM_25975.

No. 11, at 2, n.2 & 19, the evidence does not include any recorded calls with Allison. And the quote it attributes to Mr. Allison as "I won't quit til I'm dead. My only goal in life is to fucking destroy the enemy" is taken completely out of context. The exhibit attached to the government's brief makes clear that his statement that he won't quit is in reference to continuing to disseminate videos on Telegram and destroying censorship. Exhibit B (sealed) ("the enemy fears unbanned more than any other channel. I've had over 50 YT [You Tube] channels banned and now 10 here. I won't quit til I'm dead. My only goal in life is to destroy the enemy."). This does not suggest that he would disobey a court order imposing conditions of release banning access to the internet.

In a similar vein, the government argues that "if the defendants are released, there is a strong likelihood that they will attempt to destroy evidence or instruct other members of the Terrorgram Collective to do so on their behalf." ECF No. 11, at 15. The government arrested the defendants more than five months ago and have provided over 58,000 bates-numbered pages of documents, photographs, reports, and recordings from Telegram and elsewhere. The government has also acknowledged seizing laptops, cell phones, hard drives, and other storage devices from the defendants. As the government has argued, "the volume of evidence against the Defendants is staggering." ECF No. 11, at 10. The evidence against Mr. Allison consists almost entirely of hyperbolic communications and files posted on Telegram, rather than testimony from informants or eyewitnesses. There is no reason to believe that Mr. Allison would now have the ability to destroy evidence or would otherwise desire to jeopardize his strong First Amendment defense if released.

Finally, the defendants' arrests have been widely reported and Telegram's founder Pavel Durov has agreed to cooperate with lawful requests to turn over

16

information on Telegram users and their communications on the platform.[8]  At this point, Telegram users are aware that Mr. Allison has been charged criminally and that government agents conduct extensive surveillance on Telegram.  In short, there is no reason to believe that Mr. Allison would be a danger to the community if he is released with reasonable conditions, such as home confinement and no access to the internet.

      **5.**     **Other factors weighing in favor of release pending trial.**

This is an exceedingly complex case involving a large number of serious charges and classified materials.  Based on the case's complexity, the Court appointed two attorneys for Mr. Allison.  No trial date has been set and a lengthy pretrial period will be necessary for adequate defense preparation.

Further, Mr. Allison is now detained at the Butte County Jail, which requires three hours, round-trip travel time for his attorneys to meet with him.  The jail does not permit counsel to meet with their client during the 11 a.m. to 12:30 p.m. lunch period and legal visits are not allowed on weekends until after social visiting ends at 5:30 p.m.  Further, with the stringent protective order in place in this case and counsel's schedule in other cases, it is very difficult for the defense team to adequately review all the discovery with their client in any timely manner.  The majority of discovery is labeled "sensitive" and cannot be left with Mr. Allison to review on his own and voluminous other materials that can only be provided if the defense completes time-consuming redactions.

The lengthy period of pretrial detention that is needed to adequately prepare for trial raises serious constitutional issues and is another factor favoring pretrial

---

[8]   https://www.cnn.com/2024/09/23/tech/telegram-ceo-durov-arrest-user-data-changes/index.html

release.  *See, e.g., Motamedi,* 767 F.2d at 1405 ("The Fifth and Eighth Amendments' prohibitions of deprivation of liberty without due process and of excessive bail require careful review of pretrial detention orders to ensure that the statutory mandate has been respected."); *United States v. Torres,* 995 F.3d 695, 708 (9th Cir. 2021) ("It is undisputed that at some point, excessive pretrial detention can 'become excessively prolonged, and therefore punitive,' resulting in a due process violation.") (quoting *United States v. Salerno,* 481 U.S. 739, 747 n.4 (1987)).  If Mr. Allison is released to home confinement at his father's residence, the defense team can make arrangements to travel to Missouri to review discovery with him.

## IV.  Conclusion

For these reasons, the Court should grant defendant Matthew Allison's motion for release pending trial.

Dated:  February 3, 2025

Respectfully submitted,

/s/ Kyle Knapp
KYLE KNAPP

/s/ John Balazs
JOHN BALAZS

Attorneys for Defendant
MATTHEW ROBERT ALLISON

18