ERIC GRANT
United States Attorney
ROBERT ABENDROTH
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

HARMEET K. DHILLON
Assistant Attorney General, Civil Rights Division
CHRISTOPHER J. PERRAS
Special Litigation Counsel
SAMUEL KUHN
Trial Attorney
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-3847

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>    v.<br><br>MATTHEW ROBERT ALLISON<br><br>                  Defendant. | CASE NO. 2:24-CR-00257-DJC<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |

      The United States of America, by and through the undersigned attorneys, respectfully opposes Defendant Allison's motion to dismiss the Indictment. ECF 81.  The United States is mindful of the strain the government shutdown has placed on all members of the criminal justice system and commends the exceptional diligence and professionalism that Mr. Balasz and Mr. Knapp have shown in effectively representing their client notwithstanding that strain.  The United States nevertheless submits that the extraordinary relief they seek is unsupported by law or precedent, would not remedy the perceived wrong,

1  and would result in the release of a white supremacist terrorist leader whom a judicial officer has
2  understandably ruled poses a danger to society. ECF 50.  Defendant has cited no legal authority
3  supporting his contention that delayed reimbursement of legal fees violates the Sixth Amendment, nor
4  has he cited a case standing for the proposition that dismissal of an indictment would be a proper
5  remedy.   This Court should decline Defendant's invitation to fashion a new legal right out of whole
6  cloth, especially one that would be unworkable to administer and would require this Court to re-write
7  judicial rules on CJA funding.  The government is mindful of the challenges of preparing for trial
8  without payment—the undersigned government attorneys have not been paid during the shutdown either
9  —but respectfully submits that those challenges do not warrant the creation of a new constitutional right
10 or unprecedented judicially created remedy.  Just as the lapse in funding has not excused the
11 undersigned government attorneys from continuing to fulfill their discovery obligations, neither should
12 it defeat the presumption that a defense attorney "will subordinate his pecuniary interests and honor his
13 primary professional responsibility to his clients in the matter at hand." *United States v. Walter-Eze*, 869
14 F.3d 891, 902 (9th Cir. 2017).  For those reasons, the Defendant's motion to dismiss should be denied.

## I.      BACKGROUND

Defendant was indicted by a grand jury on September 5, 2024, on fifteen counts: 18 U.S.C. § 371 – Conspiracy (Count One); 18 U.S.C. § 373 – Solicitation of Hate Crimes (Counts Two, Three, Four, and Five); 18 U.S.C. § 373 – Solicitation of the Murder of Federal Officials (Counts Six, Seven, and Eight); 18 U.S.C. § 119 – Doxing Federal Officials (Counts Nine, Ten, and Eleven); 18 U.S.C. § 875 – Interstate Threatening Communications (Count Twelve); 18 U.S.C. § 842(p) – Distribution of Information Relating to Explosives and Destructive Devices (Counts Thirteen and Fourteen); and 18 U.S.C. § 2339A – Conspiracy to Provide Material Support to Terrorists (Count Fifteen).  ECF 1.  The Indictment specifically alleges that the Defendant served as a leader of the Terrorgram Collective, a transnational terrorist group that promoted white supremacist accelerationism: an ideology centered on the belief that the white race is superior; that society is irreparably corrupt and cannot be saved by political action; and that violence and terrorism is necessary to ignite a race war and "accelerate" the collapse of the government and the rise of a white ethnostate.  ECF 1.  The Indictment further alleges that as leaders of the Terrorgram Collective, Defendant Allison and his co-conspirator Dallas Humber, who recently pleaded guilty to the charged

offenses, ECF 72-73, solicited individuals to commit hate crimes, terrorist attacks on critical infrastructure, and assassinations, and provided technical, inspirational, and operational guidance to equip those individuals to plan, prepare for, and successfully carry out attacks.

At Defendant's arraignment, Mr. Balazs was appointed to represent him. ECF 21.  The government filed a motion for detention, ECF 11, and a detention hearing was set before Magistrate Judge Riordan. ECF 21.  At that hearing, Defendant submitted to detention, and the Court ordered Defendant detained pending trial. ECF 25.  Shortly thereafter, Defendant asked the Court to appoint him a second defense attorney, a request the government did not oppose, and the Court appointed Mr. Knapp. ECF 31.  Defendant later renewed his motion for pretrial release, and the government filed an opposition. ECF 42, 43.  After a detention hearing, Magistrate Judge Riordan denied the Defendant's motion for release and ordered Defendant to remain in pretrial detention, finding, for several reasons, that Defendant posed a danger to the community. ECF 50.

On October 16, 2025, Defendant filed a motion to dismiss the Indictment based on delayed reimbursement of legal fees. ECF 81.  The Court directed the government to respond, and scheduled a hearing on November 14, 2025, to hear oral argument on the motion. ECF 82.

## II.   ARGUMENT

Defendant has cited no legal authority supporting his contention that delayed reimbursement of legal fees violates the Sixth Amendment—because none exists.  The cases he cites in his motion stand for general principles establishing the right to appointed counsel (*Gideon*, *Ake*) and effective assistance of counsel (*Martinez*, *Strickland*) that are not in dispute.  He has cited no case, and the government could find none through independent research, in which a court has held that delayed reimbursement of legal fees violates the Sixth Amendment.  The only court within the Eastern District of California to rule on this issue concluded that that delayed reimbursement of legal fees does *not* violate the Sixth Amendment. *United States v. Nicolas Vasquez II*, 2025 WL 2961906, at *1-2 (E.D. Cal. Oct. 20, 2025).

In the absence of supporting precedent, Defendant invites this Court to invoke its "inherent supervisory power," ECF 9—power the Ninth Circuit has cautioned should be exercised "sparingly" because it is the role of courts to *interpret* law, not *create* it. *United States v. Busher*, 817 F.2d 1409, 1411 (9th Cir. 1987).  Dismissing hundreds of indictments against criminal defendants accused of

serious crimes of violence is not the sparing and restrained exercise of judicial power contemplated by the Ninth Circuit or authorized by separation-of-powers principles.

The new rule that Defendant invites this Court to create—that delayed reimbursement of legal fees violates the Sixth Amendment and requires dismissal of an indictment—would require this Court to rewrite judicial rules and policy. After all, delayed reimbursement of legal fees to CJA counsel are expressly contemplated in the guidance promulgated by the United States Courts. CJA counsel do not receive weekly paychecks; they are paid after submitting vouchers for services rendered. *See* Guide to Judiciary Policy, Vol. 7, Guidelines for Administering the CJA and Related Statutes § 230.10, § 230.10. CJA Guidelines direct courts to provide "interim reimbursement of expenses to counsel at regular intervals in representations exceeding 90 days in duration." *Id.* at § 230.63.50. CJA attorneys are thus not eligible for interim reimbursement until they represent a client for at least 90 days, so delayed reimbursement of several months is the rule, not an exceptional circumstance warranting extraordinary relief. Moreover, CJA Guidelines contemplate that "extraordinary circumstances" may justify delays in reimbursement. *Id.* A "historic" lapse in CJA funding (ECF 81, at 2) exacerbated by the longest government shutdown in more than forty years is undoubtedly an extraordinary circumstance that would warrant a delay in processing panel attorney reimbursements. CNN, Gillian Roberts and Kannita Iyer, The last government shutdown was the longest in nearly 50 years. Here are all the recent shutdowns in one chart (updated Oct. 21, 2025), https://www.cnn.com/politics/longest-government-shutdown-vis (last visited Nov. 2, 2025).

Even if this Court were open to re-writing judicial rules on CJA reimbursement, the Defendant has not provided the Court with a workable rule. As detailed in the last paragraph, CJA reimbursement, by its very nature, requires *some* delay. How much delay is too much? The Defendant provides no answer and proposes no standard. If this Court were to rule in his favor, it would have to make up an arbitrary number. Similar motions are pending before other judges in this district. If those judges were to rule in favor of similarly situated defendants, they, too, would have to make up arbitrary numbers. Chances are, those arbitrary numbers would be different, which would mean that similarly situated defendants in the same district would face drastically different outcomes depending on the district court judge they happened to appear before. For that reason, among others, district court judges are ill-

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS

4

1  positioned to re-write judicial rules on CJA reimbursement; that is legislative judgment best suited for
2  Congress or a judicial committee with experience and expertise administrating CJA funding that can
3  take a big-picture view of CJA funding nationwide.

4  What is more, this is not a situation in which Defendant's attorneys are being forced to represent
5  him without pay—a "failure to fund appointed counsel," as he puts it. ECF 81.  It is a matter of delay,
6  not denial.  Defendant's attorneys are, ultimately, guaranteed to be paid.  As the United States Courts
7  Defender Services explains, "Panel attorney payments will resume when a continuing resolution is
8  passed by Congress and signed into law by the President."  United States Courts: Defender
9  Services, CJA Panel Attorney Funds Information FY 2025 (updated: Oct. 6, 2025),
10 https://www.uscourts.gov/about-federal-courts/defender-services/cja-panel-attorney-funds-information-
11 fy-2025 (last visited Nov. 2, 2025).  Defense counsel can continue to zealously advocate on behalf of
12 their client with the assurance that they will be reimbursed for all of their services rendered.

13 The government is mindful of the challenges of preparing for trial without payment—the
14 undersigned government attorneys have not been paid during the shutdown either—but respectfully
15 submits that those challenges do not warrant the creation of a new constitutional right or unprecedented
16 judicially created remedy.  Just as the lapse in funding has not excused the undersigned government
17 attorneys from continuing to fulfill their discovery obligations, neither should it defeat the presumption
18 that a defense attorney "will subordinate his pecuniary interests and honor his primary professional
19 responsibility to his clients in the matter at hand." *Walter-Eze*, 869 F.3d at 902.

20 Defendant asserts that delayed reimbursement of legal fees creates "a fundamental imbalance in
21 the adversarial system" and gives the government an "inherently unfair structural advantage." ECF 81,
22 at 6, 9.  If government counsel were being paid during the shutdown while defense counsel were not,
23 that argument might have purchase.  But that is not the case.  Counsel on both sides are not being paid
24 during the shutdown, and counsel on both sides will be reimbursed after the shutdown's conclusion.
25 Litigating cases without compensation is a hardship, to be sure, but it is a hardship that both sides
26 endure, consistent with their obligations as officers of the Court.  And unlike defense counsel, who may
27 retain paying clients during the shutdown to compensate for the lapse in CJA funding, government
28 attorneys are barred from receiving outside compensation.  So if there is an imbalance, it tilts in the

GOVERNMENT'S OPPOSITION TO DEFENDANT'S           5
MOTION TO DISMISS

opposite direction.

Defendant's ability to prepare a defense and his right to a fair trial has not been compromised by delayed reimbursement. No trial date has been set or requested. The filing of this motion to dismiss is evidence of defense counsel's continued ability to conceive, research, draft, and file motions on Mr. Allison's behalf. Defense counsel asserts that it is unfair for them to bear the burden of travel costs until the government reopens. The government agrees that is unfair. Lead counsel for the government has continued to travel for work during the shutdown and has incurred travel expenses he is personally responsible for that will not be reimbursed until the shutdown's conclusion. The government shutdown has created unfair conditions for all members of the criminal justice system. The hard-working defense attorneys, prosecutors, judges, and court staff should be recognized for their steadfast professionalism and commitment to their solemn constitutional duties. The government understands that some counsel may have personal financial circumstances that prevent them from continuing to discharge their duties without immediate compensation. In such cases, the proper remedy is not dismissal, but withdrawal and substitution of counsel. But even that narrow remedy is disfavored for the delayed payment of legal fees. *See United States v. O'Neil*, 118 F.3d 65, 69-72 (2d Cir. 1997) ("There is little question that a defendant's failure to pay fees may cause some divisiveness between attorney and client, but we presume that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding the fee dispute."); *Caderno v. United States*, 256 F.3d 1213, 1219 (11th Cir. 2001) ("Although a 'defendant's failure to pay fees may cause some divisiveness between attorney and client,' courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client").

The government has not found a single case in which a remedy other than withdrawal or a continuance was granted due to nonpayment or delayed payment of legal fees. Indeed, dismissal of a valid indictment is not an appropriate remedy even for far more serious violations of a defendant's right to counsel. For instance, courts have examined fact patterns where the government prevented defense counsel from communicating with a defendant, where law enforcement officers improperly listened to privileged communications, and where post-indictment line-ups were performed without the defendant having the benefit of counsel. *See United States v. Morrison*, 449 U.S. 361, 364-65 (1981) (compiling

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS

6

cases).  These violations are based upon circumstances on which there is a direct intrusion or prohibition on access to counsel—a far more severe potential violation than delayed reimbursement.  Even those cases are subject to the rule that a remedy must be tailored to the injury caused, and dismissal of an indictment is a remedy of last resort.  *Morrison*, 449 U.S. at 365.  Where there has been government interference with the attorney-client right, even if that action is deliberate, dismissal of the indictment is "plainly inappropriate" without demonstrable prejudice.  *Id.*

Defendant has failed to carry his burden of demonstrating actual prejudice traceable to the delayed reimbursement of his attorneys. *United States v. Isgro*, 975 F.2d 1091, 1094 (9th Cir. 1992) ("In its recent jurisprudence . . . the Supreme Court has moved . . . toward a rule that a court should not use its supervisory powers to mete out punishment absent *prejudice* to a defendant." (emphasis in original) (citing *United States v. Hasting*, 461 U.S. 499, 504-07 (1983))).  In the absence of any precedent for the extraordinary relief the Defendant requests, and of any prejudice to Defendant, the present situation is clearly not the type of "extremely limited circumstance[]" for which "the power to dismiss an indictment is reserved." *Whitehouse v. United States District Court*, 53 F.3d 1349, 1360 (1st Cir. 1995) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988)).

Defendant argues, in the alternative, that if the Court denies his motion to dismiss the Indictment, it should release him from federal custody. ECF 81, at 11.  But doing so would violate the Bail Reform Act ("BRA").

The BRA provides that if a "judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community, such judicial officer *shall* order the detention of the person before trial." 18 U.S.C. § 3142(e)(1) (emphasis added).  This provision means that if a judicial officer finds, after a detention hearing, that no conditions of release would mitigate a defendant's risk of flight or danger to the community, detention is mandatory.  A judicial officer has already made that finding with respect to the Defendant, ECF 50, based on the grounds detailed in the government's motion for detention, ECF 11, and opposition to his motion for bail review, ECF 45, 54, which means that the BRA compels his continued pretrial detention. *See United States v. Vasquez II,* 2025 WL 2961906, at *7 (rejecting motion for pretrial release due to the lapse in funding because doing so "would ignore the Pretrial Services officer's

determination that [defendant] poses both a flight risk and an ongoing danger to the public."). What is more, the legislative judgment reflected in the BRA that criminal defendants who pose a danger to the community must be detained pending trial makes good sense, as the facts of this case underscore.

That "temporary release" provision of the BRA, 18 U.S.C. § 3142(i), does not permit a Court to override that legislative judgment unless temporary release is "necessary for preparation of the person's defense or for another compelling reason." Temporary release under § 3142(i) is reserved for "extraordinary circumstances" that prevent a defendant from effectively preparing his defense while in custody, *United States v. Rebollo-Andino*, 312 F. App'x 346, at *2 (1st Cir. Mar. 6, 2009), such as a defendant's "terminal illness or serious injuries." *United States v. Clark*, 448 F.Supp.3d 1152, 1155 (D. Kans. 2020) (quoting *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020)). The Defendant does not argue that releasing him from federal custody is necessary to prepare his defense. Rather, he asserts that the reimbursement delay presents a "compelling reason" for his temporary release and a stay of proceedings "until the defense team's funding is fully restored." ECF 81, at 12. But if the case were stayed until the government re-opens, and defense counsel refused to work on it during that period, then releasing the Defendant would serve no purpose. It would not enable him to prepare for trial or assist in his own defense. It would just punish the government—an understandable impulse, given the strain the shutdown has placed on the criminal justice system, but one that would not remedy the issue at hand.

Furthermore, the Defendant has not shown, as he must, that temporary release is necessary to address special circumstances specific to his case. *See United States v. Moreno Garcia*, No. 1:19-CR-00256-NONE-SKO, 2020 WL 3472249, at *2 (E.D. Cal. June 25, 2020) ("Nothing in the Bail Reform Act, including section 3142(i), authorizes pretrial release under the generic pandemic conditions currently existing that—while undeniably grave—apply across the board to every pretrial detainee in [ ] custody." (quoting *United States v. Villegas*, No. 2:19-CR-568-AB, 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020))). Just as "generalized COVID-19 fears" are insufficient to trigger temporary release absent a showing that a defendant is particularly vulnerable because of an underlying medical condition, *Terrone*, 454 F. Supp.3d at 1021-22, a defendant seeking temporary release based on delayed reimbursement must show that the funding lapse has a unique prejudicial impact on his case in particular.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS

8

Defendant has not made this showing.

Defendant erroneously claims that a pretrial detainee's risk of flight and danger to the community is irrelevant to a court's assessment of whether a "compelling reason" justifies his temporary release under § 3142(i).  ECF 81, at 12.  This contention is belied by the case law, none of which Defendant cites. *See, e.g., United States v. Pineda*, No. 1:19-CR-00195-NODJ-BAM-1, 2025 WL 268954, at *1 (E.D. Cal. Jan. 21, 2025) ("Under the law, the Court's primary consideration is Defendant's dangerousness and risk of flight" when assessing motions for temporary release under § 3142(i) (collecting cases)); *United States v. Lopez*, No. 1:22-CR-00159-JLT-SKO-1, 2024 WL 3304188, at *2 (E.D. Cal. July 3, 2024) (same); *United States v. Garcha*, 445 F.Supp.3d 93, 97 (N.D. Cal. 2020) (considering pretrial detainee's risk of flight in assessing § 3142(i) motion).

A judicial officer has already found that those risks compel the Defendant's pretrial detention.  ECF 50.  Defendant Allison is no ordinary criminal defendant; he is the leader of a transnational terrorist group charged with soliciting the assassination of federal officials, terrorist attacks on critical infrastructure, and bias-motivated mass-shootings; and providing material support to terrorists to equip them to plan, prepare for, and successfully carry out attacks.  These are not threadbare, unsubstantiated allegations; his co-defendant, Dallas Humber, has already pleaded guilty to all of the charged offenses, ECF 72-73, as have other members of the Terrorgram Collective, both domestically[1] and abroad.[2]  As factual basis to Defendant Humber's plea agreement spells out, the attacks that she and Defendant Allison solicited were carried out, resulting in the senseless murder of dozens of innocent people all over the world, ECF 72—murders that she and Defendant Allison not only celebrated but used as propaganda in an effort to incite more attacks.  For that reason, and the reasons detailed in the government's motion

---

[1] *See United States v. Benton*, Case No. 2:24-cr-00162 (W.D. Wash.); *United States v. Russell and Clendaniel*, Case No. 1:23-cr-00056 (D. Md.); *United States v. Lightner*, Case No. 8:24-cr-00021 (M.D. Fl.); and *United States v. Philippi*, Case No. 3:25-cr-00001 (M.D. Tenn.).

[2] Matthew Althorpe and Pavol Benadik, two former Terrorgram leaders with whom Defendants Allison and Humber collaborated on The Hard Reset, among other Terrorgram projects, have pleaded guilty to terrorism offenses in Canada and Slovakia, respectively. *See* A.C. Thompson, and James Bandler, *The Rise and Fall of Terrorgram: Inside a Global Online Hate Network*, PROPUBLICA, *available at* https://www.propublica.org/article/rise-and-fall-terrorgram-inside-global-online-hate-network-frontline-telegram; Jean-Philippe Nadeau and Muriel Draaisma, *Ontario man pleads guilty in Toronto to 3 terrorism charges*, CBC NEWS – TORONTO, *available at* https://www.cbc.ca/news/canada/toronto/ontario-man-guilty-plea-toronto-terrorism-charges-9.6934174.

for detention, ECF 11, and opposition to Defendant Allison's motion for bail review, ECF 45, 54, releasing the Defendant would pose a grave risk of danger to innocent people around the world. Were the Defendant released from federal custody, aware of the overwhelming evidence against him and the prospect of a life sentence hanging over his head, he would have a significant incentive to flee the country or worse: to "go down fucking shooting," as he has already pledged to do. ECF 11. There are good reasons for courts to be frustrated with the government for a shutdown that has placed a strain on the criminal justice system. Releasing a terrorist leader committed to overthrowing that government by killing innocent people is not the solution.

### III. CONCLUSION

For the reasons set forth above, Defendant Allison's Motion to Dismiss the Indictment (ECF 81) should be denied.

Dated: November 6, 2025

ERIC GRANT
United States Attorney

/s/
ROBERT ABENDROTH
Assistant United States Attorney

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

/s/
CHRISTOPHER J. PERRAS
Special Litigation Counsel
SAMUEL KUHN
Trial Attorney

Attorneys for United States of America