ERIC GRANT
United States Attorney
ROBERT ABENDROTH
Assistant United States Attorney

    United States Attorney's Office
    501 I Street, Suite 10-100
    Sacramento, CA 95814
    Telephone: (916) 554-2700
    robert.abendroth@usdoj.gov

HARMEET K. DHILLON
Assistant Attorney General, Civil Rights Division
U.S. Department of Justice
CHRISTOPHER J. PERRAS
Special Litigation Counsel
SAMUEL A. KUHN
Trial Attorney

    U.S. Department of Justice
    950 Pennsylvania Avenue NW,
    Washington, DC 20530
    Telephone: (202) 307-6962
    christopher.perras@usdoj.gov
    samuel.kuhn@usdoj.gov

JOHN A. EISENBERG
Assistant Attorney General, National Security Division
PATRICK CASHMAN
Trial Attorney

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone: (202) 514-2007

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DALLAS ERIN HUMBER,<br><br>    Defendant. | CASE NO. 2:24-CR-257 DC<br><br>GOVERNMENT'S FORMAL PSR OBJECTIONS AND SENTENCING MEMORANDUM<br><br>SENTENCING DATE: Dec. 5, 2025<br>TIME: 9:30am<br>COURT: Hon. Dena Coggins |

GOVERNMENT'S SENTENCING MEMORANDUM    1

For the reasons set forth in this Sentencing Memorandum, the United States of America, by and through the undersigned attorneys, respectfully asks this Court to accept the plea agreement and to sentence the Defendant to 30 years of imprisonment to be followed by a life term of supervised release.

## I.   BACKGROUND

From July 2022 until her arrest in September 2024, Defendant Dallas Humber served as a leader of the Terrorgram Collective, a transnational terrorist group. ECF 72, Exhibit A. The Terrorgram Collective promoted white supremacist accelerationism: an ideology centered on the belief that the white race is superior; that society is irreparably corrupt and cannot be saved by political action; and that violence and terrorism is necessary to ignite a race war and "accelerate" the collapse of the government and the rise of a white ethnostate. *Id.*  To achieve that end, Defendant Humber and other members of the Terrorgram Collective solicited individuals to commit hate crimes, terrorist attacks on critical infrastructure, and assassinations; and provided technical, inspirational, and operational guidance to equip those individuals to plan, prepare for, and successfully carry out those attacks. *Id.*  Inspired and guided by Defendant Humber and the Terrorgram Collective, three individuals committed bias-motivated attacks, two individuals plotted attacks on critical infrastructure, and two individuals attempted to assassinate public officials. *Id.*

In connection with that conduct, the Indictment charged Defendant Humber and her co-defendant Matthew Allison with fifteen felony offenses: 18 U.S.C. § 371 – Conspiracy (Count One); 18 U.S.C. § 373 – Solicitation of Hate Crimes (Counts Two, Three, Four, and Five); 18 U.S.C. § 373 – Solicitation of the Murder of Federal Officials (Counts Six, Seven, and Eight); 18 U.S.C. § 119 – Doxing Federal Officials (Counts Nine, Ten, and Eleven); 18 U.S.C. § 875 – Interstate Threatening Communications (Count Twelve); 18 U.S.C. § 842(p) – Distribution of Information Relating to Explosives and Destructive Devices (Counts Thirteen and Fourteen); and 18 U.S.C. § 2339A – Conspiracy to Provide Material Support to Terrorists (Count Fifteen). ECF 1.

On August 8, 2025, Defendant Humber and the United States (together, "the parties") entered into a plea agreement governed by Federal Rule of Criminal Procedure ("Rule") 11(c)(1)(C). ECF 72. Pursuant to that plea agreement, the Defendant agreed to plead guilty to all fifteen counts charged in the Indictment, and stipulated that the allegations supporting those charges, outlined in the Indictment and Exhibit A of the plea agreement, are true and correct. ECF 1, 72.  The parties agreed that a sentence of

GOVERNMENT'S SENTENCING MEMORANDUM    2

incarceration from 25 to 30 years in prison, followed by a lifetime period of supervised release, would be a just and appropriate sentence. ECF 72.  At the Defendant's plea hearing, the Defendant pleaded guilty to the fifteen counts in the Indictment, and the Court found that her guilty pleas were knowing and voluntary and supported by a sufficient factual basis. ECF 73.  Because the parties' agreed-upon 25-30 year term of imprisonment would be binding if the Court accepted the plea agreement, pursuant to Rule 11(c)(1)(C), the Court deferred acceptance of the plea agreement pending its review of the presentence report ("PSR") and the parties' sentencing submissions. ECF 73.  The PSR was filed on November 20, 2025. ECF 88.  The Defendant's sentencing hearing is set for December 5, 2025. ECF 73.

## II.    SENTENCING GUIDELINES

### A.    PSR

The PSR concludes that the Defendant's Guideline range is equivalent to her statutory maximum sentence of 2,640 months (220 years) in prison. PSR, at ¶ 173.  The PSR separates the fifteen counts of conviction into eight groups of closely related counts, pursuant to § 3D1.1, and applies the offense Guidelines for First Degree Murder (Group 1 and Count 5), Solicitation to Commit Murder (Groups 2-4 and Counts 3 and 4), and Providing Material Support for a Terrorist Purpose (Count 15). PSR, at ¶ 57-103.  The PSR applies four enhancements: the hate crime enhancement (§ 3A.1.1), the terrorism enhancement (§ 3A1.4), the aggravating role enhancement (§ 3B1.1), and the use-of-a-minor enhancement (§ 3B1.4). *Id.*  The PSR applies a four-level increase, to account for the groups of closely related counts, pursuant to § 3D1.4, and a three-level decrease, pursuant to § 3E1.1, to account for Defendant's acceptance of responsibility, to arrive at a total offense level of 56, which is above the maximum total offense level of 43. PSR, at ¶ 109-16.  The Defendant's criminal history would have been II, based on her convictions for burglary (felony), possession of a false driver's license (felony), and drug possession (misdemeanor), but application of the terrorism enhancement increased her criminal history category to VI. PSR, at ¶ 123-25.  A total offense level of 43 and a criminal history category of VI ordinarily would result in a Guideline range of life in prison; however, because none of her fifteen counts of conviction authorize a sentence of life in prison (collectively, they carry a statutory maximum sentence of 220 years in prison), the Defendant's Guideline range is 220 years in prison. PSR, at ¶ 173.  After "balancing the defendant's personal history and characteristics with the serious nature of the

GOVERNMENT'S SENTENCING MEMORANDUM    3

offense, the need to protect the public, and to afford adequate deterrence," the PSR concluded that a sentence of 480 months (40 years) in prison would be appropriate, but noted that if the Court accepts the plea agreement, which was made pursuant to Rule 11(c)(1)(C), the Court must sentence the Defendant to a term of imprisonment between 25 years (minimum) and 30 years (maximum). *See* PSR Sentencing Recommendation; ECF 72, Part VI.C.

### B.   Government's PSR Objections

The United States agrees with the majority of the Guidelines calculations in the PSR as well as the PSR's bottom-line conclusion that the Defendant's Guidelines range is 2,640 months (220 years) in prison, which, for all practical purposes, amounts to life in prison.

The United States objects to the following Guidelines calculations, but notes that neither objection, if sustained, would impact Defendant's Guidelines range:

Grouping of Count 13.  The United States generally agrees with the PSR's recommendation to group the fifteen counts of conviction, pursuant to § 3D1.2(a), but respectfully submits that Count 13, which is predicated on the Defendant's dissemination of a video with detailed instructions on how to bomb a federal building, should not be grouped with Group 2, which is predicated on the Defendant's solicitation of the murder of Federal Official 1, because they are predicated on different conduct and involve different victims and different acts and transactions. U.S.S.G. § 3D1.2.  The United States respectfully submits that the appropriate offense guideline for Count 13 is § 2K1.3(a)(3) ("Prohibited Transactions Involving Explosive Materials").

Official victim enhancement.  The United States respectfully submits that the official victim enhancement (§ 3A1.2) applies to Groups 2, 3, and 4 because the targeted victims of those offenses are current or former government officials and the offenses were motivated by their official status. U.S.S.G. § 3A1.2(a). Because the underlying offense guideline (Conspiracy or Solicitation to Commit Murder) is from Chapter Two, Part A, application of this enhancement would result in a six-level increase to the adjusted offense levels of Groups 2, 3, and 4, resulting in an adjusted offense level of 51 for each group. U.S.S.G. § 3A1.2(b).  Under § 3D1.4, each group would be assigned 1 unit (not .5 units), which would result in an increase of five levels (not four levels), and a combined offense level of 57 (not 56). *See* U.S.S.G. § § 3D1.4; PSR, at ¶ 109-12.

GOVERNMENT'S SENTENCING MEMORANDUM    4

### C. Impact of Binding Plea Agreement

Federal Rule of Criminal Procedure Rule 11(c)(1)(C) provides that if the parties enter into a plea agreement pursuant to that subsection, and they "agree that a specific sentence or sentencing range is the appropriate disposition of the case," the parties' sentencing "recommendation or request binds the court once the court accepts the plea agreement." Fed. R. Crim. Pro. 11(c)(1)(C); *see also United States v. Davis*, 825 F.3d 1014, 1017 (9th Cir. 2016) ("[U]nder Rule 11(c)(1)(C), the district court had discretion to accept or reject the proposed agreement and recommended sentence. If the district court accepted the agreement, then under Rule 11(c)(1)(C) the recommended sentence would be binding on the court. On the other hand, if the court rejected the recommended sentence, the parties could withdraw from the agreement.").

The Guidelines instruct that "[i]n the case of a plea agreement that includes a specific sentence (Rule 11(c)(1)(C)), the court may accept the agreement if the court is satisfied either that: the agreed sentence is within the applicable guideline range; or (A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form." U.S.S.G. § 6B1.2(c).

### III. REASONS WHY COURT SHOULD ACCEPT PLEA AGREEMENT

The United States respectfully submits that there are five "justifiable reasons" this Court should accept the parties' Rule 11(c)(1)(C) plea agreement, which includes an agreed-upon sentencing range of between 25 years (minimum) and 30 years (maximum). *See* ECF 72, Part VI.C.

First, accepting the plea agreement and sentencing the Defendant to a 25-30 year term of imprisonment would serve the interest of certainty and finality. "The government has a strong and legitimate interest both in the finality of convictions and in the enforcement of plea bargains." *United States v. Dyer*, 136 F.3d 417, 429 (5th Cir. 1998). Indeed, "the contractually bargained-for benefit of finality of judgment is a primary motivational force behind the government's willingness to engage in plea negotiations." *Soto v. United States*, No. CR F 06-0315-06 AWI, 2009 WL 1862454, at *5 (E.D. Cal. June 29, 2009), *aff'd*, 496 F. App'x 708 (9th Cir. 2012). In particular, a plea agreement eliminates the risk that a guilty defendant will be acquitted at trial or have her conviction overturned on appeal, thus enabling a court to impose a sentence that furthers the statutory goals of sentencing outlined in 18 U.S.C. § 3553(a). *See United States v. Coney*, 390 F. Supp. 2d 844, 853 (D. Neb. 2005) (accepting binding plea agreement

with an agreed upon below-Guidelines sentence in part because "a trial may have resulted in the unfortunate acquittal of one or more guilty defendants" and "the statutory goal of protecting the public from further crimes by each of the three defendants was furthered by the certainty of the plea bargains"). The government's interest in certainty and finality is especially compelling in this case: the Court's acceptance of the plea agreement would ensure that a white supremacist terrorist leader responsible for the murder of innocent people around the world will be held accountable for her crimes and will spend at least a quarter century in federal prison, where she will no longer be able to harm anyone.

Second, accepting the plea agreement and sentencing the Defendant to a 25-30 year term of imprisonment would save the Court and government a substantial amount of time and resources. In *United States v. Carrozza*, 807 F. Supp. 156, 160-61 (D. Mass. 1992), *aff'd*, 4 F.3d 70 (1st Cir. 1993), the district court accepted a binding plea agreement between the government and the defendants—Mafia capos and hit men—with an agreed-upon sentencing range lower than the defendants deserved, because the binding plea agreement "serve[d] the interests of justice" in other ways: (1) it "eliminated the necessity of a trial expected to take six months to a year"; (2) it "eliminated the risk of a mistrial"; (3) it "eliminated the protracted appeals involving uncertain issues of law which would inevitably have followed any conviction"; (4) it permitted the "redeployment of limited federal investigative and prosecutorial resources"; and (5) it "assured that dangerous defendants would be incarcerated, and not threaten society, for many years." The same justifiable reasons support acceptance of the binding plea agreement in this case.

Third, accepting the plea agreement and sentencing the Defendant to a 25-30 year term of imprisonment, which she would serve at a secure BOP facility, would restrict her ability to radicalize others and incite them to violence. The Defendant has spent the bulk of her pretrial detention at the Wayne Brown Correctional Facility in Nevada County, California, which is run by the Nevada County Sheriff's Department. During her time in custody, the Defendant has shared her white supremacist beliefs with other pretrial detainees at that facility and has continued to coordinate with members of the Terrorgram Collective and other white supremacist attackers via letters, phone calls, and video calls. Given the Defendant's history of radicalizing others and grooming them to commit attacks on her behalf, her continued pretrial detention at a county-run facility without adequate rules and resources to prevent her from doing so poses an ongoing security risk. That is another reason this Court should accept the plea

agreement and sentence the Defendant: so she can be transferred to a secure BOP facility with restrictions in place to prevent her from continuing to engage in the same conduct that landed her there.

Fourth, there are several mitigating factors warranting a sentence below the Defendant's effective Guidelines range of life in prison. Most significant among them is the Defendant's extensive and disturbing history of trauma, summarized in Part C (Offender Characteristics) of the PSR. Many criminal defendants have some degree of trauma in their lives, but few have such an "extensive history of physical, verbal, and emotional abuse." PSR, at ¶ 195. The Defendant's significant history of trauma does not excuse her criminal conduct, but it is a mitigating factor warranting a downward variance from her effective Guidelines range of life in prison. PSR Sentencing Recommendation; *United States v. Roe*, 976 F.2d 1216, 1218 (9th Cir. 1992). Another mitigating factor is the Defendant's early and full acceptance of responsibility for her crimes. Unlike many criminal defendants in her position, the Defendant has never attempted to minimize or excuse her conduct, and her early acceptance of responsibility has allowed the government to focus its limited time and resources on bringing to justice other members of the Terrorgram Collective domestically and abroad.

Fifth, as set forth in Part V.A of this memorandum, a 25-30 year term of imprisonment would align the Defendant's sentence with the sentences of similarly situated defendants, thus promoting the interest in sentencing uniformity. 18 U.S.C. § 3553(a)(6).

Those five circumstances provide the Court with "justifiable reasons" to conclude that the binding plea agreement "serves the interests of justice" and should be accepted. *See Carrozza*, 807 F. Supp. at 160-61; U.S.S.G. § 6B1.2(c).

### IV. GOVERNMENT'S SENTENCING RECOMMENDATION

If the Court accepts the plea agreement, the United States recommends a sentence of 30 years of imprisonment to be followed by a life term of supervised release. The government's requested sentence would further the statutory goals of sentencing because, as explained below, it would account for "the nature and circumstances of the offense" and "the history and characteristics of the defendant," and it would capture "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1)-(a)(2).

GOVERNMENT'S SENTENCING MEMORANDUM     7

A. **Nature and circumstances of the offenses**

It would be difficult to imagine crimes more serious and worthy of condemnation than the Defendant's crimes of conviction. As the Defendant admitted in her factual basis, she served as a leader of the Terrorgram Collective, a transnational terrorist group that promoted white supremacist accelerationism: an ideology centered on the belief that the white race is superior; that society is irreparably corrupt and cannot be saved by political action; and that violence and terrorism is necessary to ignite a race war and "accelerate" the collapse of the government and the rise of a white ethnostate. The Defendant sought to accomplish that end by targeting and radicalizing vulnerable teenagers; by grooming them to commit hate crimes, terrorist attacks on critical infrastructure, and assassinations; and by providing them technical, inspirational, and operational guidance to plan, prepare for, and successfully carry out those attacks. Inspired and guided by her leadership, the following seven individuals plotted and/or committed attacks in furtherance of white supremacist accelerationism:

(1) J.K. shot three people, killing two, at an LGBT bar in Bratislava, Slovakia;

(2) G.C. shot eleven people, killing four, at two schools in Aracruz, Brazil;

(3) A.K. stabbed five people outside of a mosque in Eskisehir, Turkey;

(4) A.T. plotted to attack an energy facility in New Jersey;

(5) S.P. plotted to bomb an energy facility in Tennessee;

(6) J.P. attempted to assassinate an Australian official; and

(7) N.C. murdered two people in Wisconsin in furtherance of his plot to assassinate a federal official but was arrested before he could carry out that assassination.

The nature and circumstances of the Defendant's offenses are "horrific" in every respect, and her sentence should reflect that. *See United States v. Ressam*, 679 F.3d 1069, 1090 (9th Cir. 2012) (en banc) (ruling that defendant's sentence was substantively unreasonable in part because it did not properly account for the "horrific" nature and circumstances of the terrorist attack the defendant had planned); *United States v. Gregory*, No. 205-CR-893, 2007 WL 2446841, at *7 (D. Utah Aug. 23, 2007), *as amended* (Aug. 28, 2007) (explaining that defendant's sentence must capture that he was a member of a white supremacist terrorist group who engaged in a "pattern of criminal activity designed to fund the forced overthrow of the United States government").

**B.     History and characteristics of the Defendant**

The history and characteristics of the Defendant further militate in favor of a lengthy prison sentence. As noted in Part III of this Sentencing Memorandum, the Defendant has an extensive and disturbing history of trauma that the parties agree is a mitigating factor warranting a sentence below her Guidelines range of life in prison. The Defendant's history of trauma helps explain why and how a smart and promising high school student could transform into a grown woman who proudly describes herself as a "ruthless neo-Nazi terrorist" and "accelerationist martyr and icon." PSR, at ¶ 44. But the Defendant's history of trauma does not excuse her conduct, nor does it change the person she has become or mitigate the grave danger she poses to society.

The Defendant has had more than a year in custody to reflect upon her actions, and she has shown absolutely no remorse. To the contrary, her time in pretrial detention "has only served to validate, reinforce, and galvanize" her commitment to white supremacist accelerationism. PSR, at ¶ 47. She is proud of her "legacy" of death and destruction, and her only regret is not personally murdering anyone before her arrest. PSR, at ¶ 44, 47.

The Defendant has shown no interest in changing her beliefs, which she has "vowed live, fight, kill, and die for." PSR, at ¶ 46. She prays not for the strength to change, but for the strength to remain "defiant and strong until the end" like her "personal hero" Ursula Haverbeck, a German neo-Nazi who died in prison. As the Defendant put it, in her journal:

> God bless her and every white political prisoner behind bars right now. I pray we all tap into our accelerationist hivemind, channel [Haverbeck]'s courage and defiant spirit, and remain strong in the face of our own legal battles. Defiant and unapologetic no matter what punishment the system throws at us. If she can stand strong and proud even at 96yo, we have no excuse not to do the same. We owe it to her, and to the long line of political prisoners who came before her, from Nuremberg onward, to carry that torch proudly. Never back down, never apologize, raise our right arm proudly at the gallows. They can kill us, but not our faith. FUCK ZOG. HEIL HITLER.

The realization that she may spend the rest of her life in prison did not dampen the Defendant's resolve. As she put it: "it 25 years is the price I have to pay for what I believe in, so fucking be it." PSR, at ¶ 46.

GOVERNMENT'S SENTENCING MEMORANDUM     9

In short, the Defendant is an unrepentant white supremacist terrorist who is "filled with hate" and "has no regard for the laws of this land" and has demonstrated, through her words and actions, that if she is not incarcerated, she will continue to commit crimes in furtherance of her white supremacist ideology. *See United States v. White*, No. 21-11270, 2022 WL 2297541, at *1 (11th Cir. June 27, 2022).

### C.  Protecting the Public

In light of that reality, the only way to protect the public from the Defendant, who has shown no interest in rehabilitation or ability to be deterred, is to incapacitate her through a lengthy prison sentence. *See United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) ("Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."), *cited with approval in Ressam*, 679 F.3d at 1091; *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("An act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."); *Gregory*, 2007 WL 2446841, at *7 ("[The Defendant] has staunchly proclaimed his intention to engage in a 'continuing war against the corrupt and unconstitutional government of the United States' by 'whatever means possible' until '[his] last breath if need be.' The public needs protection from such people[.]").

The United States respectfully submits that a lengthy sentence in a secure BOP facility is the only practical way to protect the public from the Defendant.

### D.  Just Punishment

The United States agrees with the PSR that, in the absence of any plea agreement between the parties, a sentence of 480 months (40 years) in prison would be just punishment for the Defendant: it would further the purposes of sentencing outlined in § 3553(a) and it would strike an appropriate balance among the aggravating and mitigating factors addressed in the PSR and this Sentencing Memorandum. Had the Defendant been convicted on all counts after a jury trial, a forty-year sentence may have been appropriate. But the Defendant comes before the Court in a materially different position. She has accepted full responsibility for her crimes. Her guilty pleas have spared the government and the Court the time and resources necessary to litigate a trial that would have taken several months and appeals that would have taken several years. And they have permitted the government to redeploy limited federal investigative and

GOVERNMENT'S SENTENCING MEMORANDUM   10

prosecutorial resources to bring to justice other members of the Terrorgram Collective. Most importantly, the plea agreement ensures that a white supremacist terrorist leader responsible for the murder of innocent people around the world will spend decades in prison, where she will no longer be able to harm anyone. The government is confident in its case against the Defendant, but a conviction after trial is "not an inevitable result of these prosecutions at their inception, no matter how meritorious the charges. Inherent in our system of justice, with its presumption of innocence, its requirement that guilt be proven beyond a reasonable doubt, and its potential for jury nullification, is the risk that some who may be guilty will be acquitted." *Carrozza*, 807 F. Supp. at 160. The plea agreement eliminates that risk. For all of these reasons, the plea agreement "serves the interests of justice," *id.* at 161, and the United States respectfully asks the Court to accept it and to sentence the Defendant to 30 years in prison and a life term of supervised release.

## V. DEFENDANT'S SENTENCING RECOMMENDATION

The Defendant is requesting a sentence of 25 years in prison, the low end of her agreed-upon sentencing range. Defendant's PSR Obj. Her request is based on her claim that a 25-year sentence: (A) would avoid unwarranted sentencing disparities among similarly situated defendants; and (B) would reflect that she was not the only member of the Terrorgram Collective responsible for the attacks. The United States addresses each argument in turn.

### A. Sentencing Disparities

The Defendant points out that Matthew Althorpe and Pavol Beňadik—two Terrorgram leaders who preceded her—received (in the case of Beňadik) and will receive (in the case of Althorpe) sentences below her agreed-upon 25-30 year range; and she argues that sentencing her to 30 years in prison would create an unwarranted sentencing disparity, citing 18 U.S.C. § 3553(a)(6) (instructing courts to consider, among other factors, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). There are five flaws with her argument.

First, Althorpe and Beňadik are not similarly situated defendants because they were prosecuted and sentenced in countries (Canada and Slovakia) with sentencing laws and practices that are vastly different from those in the United States. Had Althorpe and Beňadik been convicted in the United States of crimes arising out of the same conduct, they would face much higher sentences, so they are not apt

GOVERNMENT'S SENTENCING MEMORANDUM    11

comparators. Just as it would be unhelpful for the United States to provide examples of comparatively harsh sentences for defendants who committed less egregious conduct in countries like Saudi Arabia and Singapore, it is similarly unhelpful for the defense to provide examples of comparatively lenient sentences imposed in countries with more lenient sentencing laws and practices. Because § 3553(a)(6) instructs district courts to consider the sentences of "similarly situated defendants throughout the country," not in other countries, the sentences of Althorpe and Beňadik are not instructive data points for this Court to consider. *See United States v. Joyner*, 924 F.2d 454, 460–61 (2d Cir. 1991).

Second, Beňadik received a comparatively short sentence of six years in prison in part because he cooperated with authorities and provided them with actionable information and evidence—something Defendant Humber has refused to do. A sentencing disparity is not unwarranted if it is based on one defendant's substantial assistance to authorities. *See United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009) ("[A] sentencing disparity based on cooperation [with the Government] is not unreasonable.").

Third, Althorpe and Beňadik are not similarly situated defendants, even though they also served as leaders of the Terrorgram Collective, because they were convicted of different crimes predicated on different conduct. Beňadik pleaded guilty to violations of Slovakian law predicated on his use of social media to glorify terrorists and his dissemination of instructions on how to 3D print weapons. Althorpe pleaded guilty to violations of Canadian law predicated on his work as a project manager for Terrorgram publications *Militant Accelerationism*, *Do It For the 'Gram*, and *The Hard Reset*. By contrast, Defendant Humber's crimes of conviction capture a much broader scope of criminal conduct. They include: three counts of soliciting the murder of federal officials, which are based on her work on *The List*, a hit list of specific "high value targets" for assassination (Counts 6-8); two counts of disseminating bombmaking instructions to incite a crime of violence, which are predicated on her dissemination of detailed videos and PDFs instructing her followers how to create bombs from publicly available materials (Counts 13-14); and one count of providing material support to terrorists, which is predicated on, among other things, her dissemination of detailed instructions how to destroy critical government infrastructure (Count 15). Because Althorpe and Beňadik were found guilty of crimes predicated on a smaller scope of criminal conduct, they are not "similarly situated defendants."

Fourth, the United States respectfully submits that it is not a useful exercise for either party to cherry-

GOVERNMENT'S SENTENCING MEMORANDUM    12

pick outlier sentences to support a sentencing disparities argument. In most cases, as in this one, the defense will be able to point to an unusually low sentence and the government will be able to point to an unusually high sentence in cases involving similar conduct. But district courts should not base sentencing decisions on outlier sentences; they are the very thing that § 3553(a)(6) instructs courts to avoid.

Fifth, to the extent that it is a useful exercise to survey the sentences of similarly situated defendants across the country, the United States has identified the following four cases in which defendants convicted of similar conduct—inciting terrorist attacks via social media, soliciting the murder of federal officials, leading a white supremacist terrorist organization—received sentences ranging from 30-40 years in prison:

- *United States v. Rahim*, 860 Fed. App'x 47 (5th Cir. 2021) (defendant sentenced to 30 years in prison for providing material support to ISIS by administering and moderating a social media channel designed to encourage people to join ISIS and to incite people to commit terrorist attacks in ISIS's name);
- *United States v. Saleh*, No. 15-CR-517 (WFK), 2021 WL 5544957 (E.D.N.Y. 2021) (defendant sentenced to 30 years in prison for providing material support to ISIS by, among other things, using social media (including Telegram) to spread ISIS propaganda, promote jihad, and guide others to commit terrorist attacks);
- *United States v. Hale*, 448 F.3d 971, 989 (7th Cir. 2006) (defendant sentenced to 40 years in prison for crimes he committed as the leader of a white supremacist group, including inciting a follower to commit a mass-shooting and soliciting the murder of a federal judge); and
- *United States v. Gregory*, No. 205-CR-893, 2007 WL 2446841, (D. Utah Aug. 23, 2007), *as amended* (Aug. 28, 2007) (defendant sentenced to 40 years in prison—20 years in state custody to be followed by 20 years in federal custody—for crimes he committed as a member of The Order, a white supremacist organization devoted to overthrowing the government and inciting a "racial holy war").

There are certainly outlier cases in which similarly situated defendants received higher or lower sentences than these, but the foregoing four cases establish that a 30-year sentence would align the Defendant's sentence with the sentences of defendants convicted of crimes predicated on similar conduct.

GOVERNMENT'S SENTENCING MEMORANDUM   13

B.  **Comparative Culpability**

The Defendant's second argument in support of her requested 25-year sentence is that other people played important roles in creating and running the Terrorgram Collective and in radicalizing individuals and inciting them to commit attacks. Defendant's PSR Obj. Specifically, she cites Matthew Althorpe's influence in Terrorgram chats, channels, and publications, and Pavol Beňadik's role in radicalizing Bratislava mass-shooter J.K.

The United States does not dispute that Althorpe and Beňadik played important roles, but respectfully submits that their importance does not minimize or excuse the central role that the Defendant played in the Terrorgram Collective. It is true that Matthew Althorpe ran some of the most influential early Terrorgram chats and channels and was the central organizing force behind the first few Terrorgram publications: *Militant Accelerationism* and *Do It For the 'Gram*. But when Althorpe left Terrorgram in the summer of 2022, Defendants Humber and Allison took his place: thereafter, they ran the most influential Terrorgram chats and channels, they groomed and radicalized vulnerable teenagers, they finalized and disseminated Terrorgram publication *The Hard Reset*, they co-created Terrorgram documentary *White Terror*, and they served as project managers for subsequent Terrorgram publications *The List* and *The Saint Encyclopedia*. It is true that Pavol Beňadik played a significant role in radicalizing his countryman J.K. and grooming him to commit an attack. But when Beňadik was arrested in May 2022, Defendants Humber and Allison continued to guide J.K. down "the path to Sainthood," *see* Exhibit A, P. 9-10, until his attack five months later in October 2022. Defendant Humber had regular conversations with J.K. in her group chat. J.K. told Defendant Humber that one of the "best parts" of *The Hard Reset* was "A Letter to the Next Disciples," a passage, personally written by Defendant Humber, that exhorts "Saint Tarrant's next disciples" (i.e., aspiring accelerationist mass-shooters) to follow through with planned attacks. *See* Exhibit B, P. 1. Defendant Humber responded, "I hope the next Saints out there read those passages and feel inspired." To further entice him to take action, Defendant Humber pledged that if J.K. "became a Saint" by committing an attack, she would narrate his manifesto, but only if the attack was successful. As she put it, "that's the cost of admission, so to speak . . . Dead targets or I don't care." In the days leading up to his eventual attack, J.K. told Defendants Humber and Allison about his plan and sent them his manifesto so they could disseminate it widely after the attack—something

GOVERNMENT'S SENTENCING MEMORANDUM    14

Defendant Humber previously offered to do in her channel post "Manifesto Distribution." *See* Exhibit A, P. 14. On October 14, 2022, after J.K. shot three victims at an LGBT bar, and was on the run from the police, he sent a direct message to Humber to let her know that he had carried out the attack that she had exhorted him to commit. J.K.'s message to Humber, which he sent her before he committed suicide, was, "not sure how much time I have but it's happening". J.K. did not need to explain that "it" meant an attack because Defendant Humber already knew based on their prior conversations. After the attack, Defendants Humber and Allison took credit for inspiring and guiding J.K., and they celebrated him as "Terrorgram's first Saint." ECF 1, at ¶ 30c, PSR ¶ 19-22. In summary, Beňadik played a significant role in brainwashing and radicalizing J.K., to be sure, but Defendants Humber and Allison were the ones who ultimately convinced him to take action.

To better enable the Court to evaluate Defendant Humber's personal contributions to the Terrorgram Collective, the United States will file under seal the following exhibits: Terrorgram posts written by the Defendant on her Hail Holy Terror and RWBC channels soliciting bias-motivated violence, terrorist attacks, and political assassinations (Exhibit A); pages of *The Hard Reset* written by the Defendant (Exhibit B); the *White Terror* documentary, which she co-created with Defendant Allison (Exhibit C); and the "Saint cards" she created to celebrate and commemorate the mass-shootings committed by J.K. and G.C., whom she considers "symbolically [her] kids" (Exhibit D). These exhibits are just a small sampling of Defendant Humber's personal contributions to the Terrorgram Collective, but they are representative of different ways in which she solicited and inspired others to commit attacks.

### VI. CONDITIONS OF SUPERVISED RELEASE

The PSR and the parties jointly recommend a life term of supervised release. ECF 72, Part VI.C; PSR Sentencing Recommendation. The United States agrees with the PSR's proposed standard conditions of release and the special conditions of release tailored to the specific dangers presented by this Defendant. The United States respectfully proposes that Special Conditions 4 and 5-7 be broadened, as follows, to more comprehensively address those dangers:

Special Condition 4. The United States agrees that Special Condition 4, which restricts the Defendant from communicating with a known member of a white supremacist group or criminal gang without prior approval from her probation officer, is warranted under the facts of this case because the

GOVERNMENT'S SENTENCING MEMORANDUM   15

crimes of conviction were the result of her collaboration with other members of a white supremacist terrorist group. The United States proposes broadening the scope of Special Condition 4 to prohibit, in addition: (1) communication with any individual, whether or not part of a group, who promotes or solicits bias-motivated hatred or violence; and (2) possession of any materials that promote or solicit bias-motivated hatred or violence. Courts have upheld similar prohibitions with the important goal of severing the "connection between the hate speech which led to the crime and the crime itself." *United States v. Bolin*, 976 F.3d 202, 210-13 (2d Cir. 2020) (upholding special condition prohibiting defendant from "participating in certain internet communities that promoted violence or crime or that were maintained by any groups espousing those ideas" because the "interests of rehabilitation and public safety would be served by separating [defendant] from racist, anti-Semitic, anti-Muslim, and other threatening communications"); *United States v. Ross*, 476 F.3d 719 (9th Cir. 2007) (upholding special condition that defendant "refrain from associating with known neo-Nazi/white supremacist members and affiliates and from possessing neo-Nazi/white supremacist paraphernalia" because the "interests of rehabilitation and public safety would be served by separating [the defendant] from neo-Nazi/white supremacist influences"); *United States v. Showalter*, 933 F.2d 573 (7th Cir. 1991) (affirming a condition restricting defendant from "participating in, or associating with, those who participate in a skinhead or neo-Nazi organization" on the grounds that the defendant "needs to be separated from other members of white supremacist groups to have a chance of staying out of trouble"); *United States v. Allen*, 364 F. Supp. 3d 1234, 1255 (D. Kan. 2019) ("Defendants are prohibited from participating in any groups, (including online groups) that advocate engaging in criminal activity or overthrowing the United States government; or associating with individuals who are known members of such groups; or participating in a militia or a group that espouses violence against Muslims or immigrants.").

Special Conditions 5-7. The United States agrees that Special Conditions 5-7, which impose restrictions on the Defendant's access to devices connected to the internet without prior approval from her probation officer, are warranted under the facts of this case because the Defendant used the internet to commit the charged crimes and collaborate with other members of the Terrorgram Collective. The United States has concerns, however, that Special Conditions 5-7 could be interpreted to give the Defendant *carte blanche* to access the internet once she receives approval to use a particular internet-

connected device (a computer or cellphone, for example), which would enable the Defendant to commit the same kind of criminal conduct for which she was convicted. Monitoring software is an insufficient safeguard because the Defendant has shown the skill and willingness to cover her tracks online and delete digital evidence that incriminates her. *See* ECF 11, P. 15 (citing examples). Moreover, monitoring software is a notification tool, not a prevention tool. For those reasons, it is the position of the United States that Special Conditions 5-7 should be modified to restrict the Defendant from using the internet entirely (not just any internet-connected device) without the prior approval of her probation officer. Courts have upheld total bans on internet use where, as here, the use of the internet was "essential" or "integral" to the convicted offense. *See United States v. Antelope*, 395 F.3d 1128, 1142 (9th Cir. 2005) (affirming imposition of condition prohibiting defendant from "possessing or using a computer with access to any 'on-line computer service' at any location (including employment) without the prior written approval of the probation department," because the Internet was "essential to the commission of [his] crime"); *United States v. Paul*, 274 F.3d 155, 169 (5th Cir. 2001) (upholding condition prohibiting any computer or internet access where defendant used the Internet "to initiate and facilitate a pattern of criminal conduct and victimization" and total ban was "need[ed] to prevent recidivism and protect the public"); *United States v. Egli*, 13 F.4th 1139, 1143, 1147-48 (10th Cir. 2021) (upholding an "absolute Internet ban for … life" where defendant had demonstrated an "inability to abide by lesser Internet restrictions," and thus "no better alternatives to an absolute ban remain[ed]"); *United States v. Johnson*, 446 F.3d 272, 282 (2d Cir. 2006) (finding total ban on internet use justified where defendant was "a sophisticated computer user" who "likely could circumvent the software needed for monitoring" and that "nothing less" than a total ban would "effectively curb [defendant's] propensities and protect the community"); *United States v. Lyons*, 564 F. App'x 131, 132 (5th Cir. 2014) (no abuse of discretion in the district court's imposition of the lifetime computer and internet ban without the court's written permission for defendant convicted of possession of child pornography); *United States v. Morais*, 670 F.3d 889, 895 (8th Cir. 2012) (upholding condition providing that defendant "shall not have access to an internet-connected computer or other device with internet capabilities or access the internet from any location without prior approval by the probation office and for a justified reason" for life term of supervised release). Given that the Defendant has "vowed to live,

GOVERNMENT'S SENTENCING MEMORANDUM    17

fight, kill and die" for her beliefs and has pledged to "radicaliz[e] as many of my likeminded brothers and sisters as possible," the United States respectfully submits that nothing short of a total ban on internet use would keep the public safe from this Defendant upon her release from prison.

## VII. VICTIM IMPACT AND RESTITUTION

Pursuant to the Crime Victims Rights' Act ("CVRA"), the United States notified victims in this case of the Defendant's sentencing hearing their right to provide victim-impact statements. To date, four victims have notified the government of their intent to provide oral and/or written victim-impact statements. Given the ongoing threat to their safety, the four victims have asked to attend the sentencing hearing remotely (via telephone call or video teleconferencing) and to read their victim-impact statements without revealing their true names—procedures approved by Magistrate Judge Riordan at Defendant Allison's detention hearing. ECF 50.

Additionally, pursuant to the CVRA, the United States notified victims in this case of their right to restitution under the plea agreement and the Mandatory Victim Restitution Act ("MVRA"). To date, as documented in PSR paragraphs 48-49 and 184-85, one victim is seeking restitution and has submitted documentation to the probation officer in support of that request.

## VIII. CONCLUSION

For the foregoing reasons, the United States respectfully asks this Court to accept the plea agreement and to impose a sentence of 30 years of imprisonment to be followed by a life term of supervised release.

Dated: November 26, 2025

| ERIC GRANT | HARMEET K. DHILLON | JOHN A. EISENBERG |
| --- | --- | --- |
| United States Attorney | Assistant Attorney General | Assistant Attorney General |
| Eastern District of California | Civil Rights Division | National Security Division |
| | | |
| /s/ *Robert Abendroth* | /s/ *Christopher J. Perras* | /s/ *Patrick Cashman* |
| ROBERT ABENDROTH | CHRISTOPHER J. PERRAS | PATRICK CASHMAN |
| Assistant U.S. Attorney | Special Litigation Counsel | Trial Attorney |
| | SAMUEL A. KUHN | |
| | Trial Attorney | |